**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF IOWA**

FILED
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA
NOV 25 2024
By:_____ Clerk of Court
Deputy

In RE: )
) Case No. 22-00744　Chapter 11
Debtor: Property Holders LTD, )
) Resistance to Debtor's Motion Objecting to
Debtor ) Compensation to Mari Davis for
) Administrator's Salary/Expenses
)
)

COMES NOW, Mari Davis, hereinafter, "Davis"), as (former) Administrator for Property Holders, LTD, and in resistance to Debtor's Motion Objecting to the previously filed Application for Compensation for administrative salary and expenses states as follows:

1. Contrary to the allegation in paragraph 1 of Debtor's Motion referencing that Charles Davisson (hereinafter "Davisson"), as president of Property Holders, hired Davis as a "subcontractor," Davis states that she was, in fact, hired, individually, as an employee; her company, RS Consulting and Management Services, was not hired by Davisson. Further, Davis was hired in an individual capacity after a discussion with Davisson, considering those issues that Davis pointed out potentially could be problematic for Property Holders in managing certain aspects of renting properties, including possible eviction actions in small claims court involving non-paying and/or non-compliant tenants.

2. Although an initial discussion regarding compensation for Davis occurred similar to that referenced in paragraph 3 of Debtor's Motion, Davis rejected the offer considering the scope of the work Davisson indicated would be involved in administrative management of the company that was broader and required greater time, effort and expertise than described in paragraph 2 of Debtor's Motion. While Davis' company, RS Consulting and Management Services, worked on a percentage as well as hourly basis, depending on the scope of the work, the percentage charged by RS Consulting is higher than that offered by Davisson. It was not feasible for Davis to provide management services Davisson described he wanted and consistently through the employment indicated he needed for the low rate initially offered.

3. Davis specifically informed Davisson that she could provide services to Property Holders in one of only two ways: 1) Davis could work with Property Holders under contract with RS Consulting and Management Services but the compensation would be at a rate greater than 5% plus bonus or 2) Davis could work individually and directly with Property Holders as an employee but, again, the compensation would be greater than Davisson's initial offer.

4. Davisson was unwilling to hire Davis' rental management company, RS Consulting and Management Services, as this would have required Davisson to fully turn over *all* aspects of managing Property Holders' rental properties, including the financial management and decision-making concerning execution of maintenance activities and hiring of those

contractors to perform maintenance services, as well as the day to day/month to month management of the properties. Davisson specifically wanted to retain management of the financial aspect of the business and also wished to retain control of maintenance. This left the only option then for Davis to work as a direct, albeit, contractual employee. The position would be contractual as the need for Davis to continue once the goals of shoring up the income to the company and renting to a better quality tenant would not necessarily continue, depending upon whether Davisson was able to acquire additional properties as he discussed interest in accomplishing. (emphasis added)

5. Davisson agreed to the "employee" status (and monthly payment of Davis' salary at the negotiated amount of $4000/month) since he was unwilling to fully turn over all aspects of managing Property Holders' rental properties as would be required under a management contract with RS Consulting and Management Services. This monthly salary was then adjusted after the initial the first few months Davis worked with Property Holders as it became clear to Davis that the scope and complexity of the work was greater than Davis initially understood especially as Davisson had not fully disclosed to Davis that the company was facing potential foreclosure of properties that were mortgaged with Green State Credit Union. Davis and Davisson agreed that Davisson would increase the compensation to $5000/month to offset the greater demands of dealing with those issues impacting Property Holders and the greater amount of time Davis was spending in dealing with management challenges and Davis would forego any bonus options. (see Attachments A and B).

6. While Davisson stated his goal in hiring Davis was to turn around the financial drain Property Holders was experiencing as a significant percentage of tenants were (and had been for some time) slow payers, nonpayers or those who relied frequently on third party payers as well as those who were uncooperative in caring for the property frequently resulting in one or more city departments assessing fees against Property Holders which had a significant impact on Property Holders' financial viability. Moreover, Davis became involved in applying for the available rental reimbursement program in order to secure rent payments from a number of Property Holders' tenants in an effort to maintain cash flow as these tenants were nonpayers and slow payers. This was particularly impactful considering the foreclosure action that Davis became aware of weeks after she began employment and Davis was concerned even as Davisson stated he was actively attempting to resolve the foreclosure action by refinancing the mortgages affected. Davisson initially presented to Davis that the refinancing action was to purchase additional properties from another local housing provider who was selling his rental properties. Davisson continued to project his intent to obtain financing to purchase these additional properties and, as Davis later learned, to pull the properties at risk of foreclosure into new loans although this ultimately did not occur. Davisson maintained also during nearly a year that Davis would be compensated fully for her employment although this also did not occur.

7. It should be noted that while Davisson was unwilling to turn over full control of Property Holders' rental properties, he did not wish to handle small claims court actions such as evictions or pursuing money damages claims and his involvement in such, although occurring occasionally prior to August, 2021, even as such actions were clearly needed in an effort to engage in leasing properties to better qualified tenants. And as many of the nonpaying or slow paying tenants often presented other management difficulties, addressing the company's rental and financial goals would specifically involve court action in at least some of the tenant situations. Thus, Davis explained that she could only handle this specific aspect of the business as an "employee" unless Property Holders was turned over - in its entirety - to RS Consulting and Management Services which can provide representation as a nonattorney in landlord-tenant matters. This was necessary because the language of the Iowa Rules of Electronic Procedure, which governs the filing of small claims court actions specifies in the definition of a "filing agent" at 16.201(13) states " . . . [only] officers, employees or nonattorney representatives of an entity - such as . . . corporation . . . or representative of an individual property owner in a landlord –tenant matter, who is authorized by law to appear on behalf of that entity or individual property owner because of the nature of the proceeding . . . "may proceed as a company's representative in small claims actions; the requirement does not permit "subcontractors" to do so and, in fact, is prohibited. Discussions regarding Davis' employment status were held multiple times between Davis and Davisson during Davis' employment and Davis understands additional discussions have occurred between Davisson and Peter and Patrick Riley, Tom Riley Law Firm, who represent Property Holders in various district court actions, of Davis' role as an "employee." It is Davis' understanding in talking with Peter Riley that Davisson understands the "employee" status which was necessary for Davis in providing administrative/management activities for Property Holders considering Davisson's retention of the financial control and maintenance activities for Property Holders.

8. As Davis did not have full decision-making powers or financial management of Property Holders, she had frequent discussions with Davisson as to how actions would proceed regarding specific tenants as well as concerns regarding those properties that were delinquent in meeting the city's rental housing criteria. Davis made recommendations to Davisson regarding proposed actions regarding various aspects of Property Holders' business model and the ongoing management of rental properties and Davis was unable to implement certain activities without Davisson's agreement. Davisson directed Davis as to how he wished to proceed in many instances. For example, Davisson informed Davis as to rental rate increases which Davis was then to implement even as Davis questioned the increased amount. Further, as there were some difficulties and delays in an HVAC professional that Davisson had used prior to Davis' employment, Davis recommended using other specific HVAC professionals in addressing tenant maintenance requests who were more reliable than the individual Davisson preferred to use. The delays that resulted in resolving HVAC related issues became problematic in late 2022 and some HVAC work was

not completed, rendering properties uninhabitable and these homes were placarded by the city.

9. It should be noted that prior to employing Davis, Davisson had been using one of the maintenance subcontractors, Michael White (hereinafter, "White") to handle the administrative management aspects of Property Holders in addition to the maintenance tasks he performed. However, it became clear to Davisson that White's handling of both the administrative function and ongoing maintenance activities had become overwhelmingly difficult for White to juggle and this had contributed to the company's financial wellbeing. Also, there was a realization that White lacked the necessary skill and experience to properly vet applicants as well as handle those activities involving court action needed to resolve tenant non-payment situations as well as potential small claims actions such as evictions and money damages claims. These were activities that Davisson was thus required to handle.

10. Contrary to the allegations in paragraph 4 of Debtor's Motion, and although Davis worked out of her, this was, according to Davisson stated to be a temporary situation. Davisson informed Davis initially he was negotiating the purchase of a building off Mt Vernon Rd SE and he intended to set up the Property Holders' office in this location. However, the purchase of this property never materialized. Later, Davisson proposed placing the office in a property he owned on the SE side of Cedar Rapids which was vacant and often used for storage. Davis agreed to initially work out of the office she rented as Davisson was essentially operating Property Holders out of his home address as was White and Davis didn't feel comfortable working out of Davisson's personal residence. Davis felt it would help with overall professional impressions to have an office to which tenants could come regarding meetings and in dropping off rent payments. Also, as Davisson and White were each operating out of their residences, tenant files were not being comprehensively being maintained. It led to difficulties in Davis obtaining complete records and documents.

11. It should be noted that Davisson provided equipment and materials for Davis to use in the administrative management activities for Property Holders. Thus, he supplied not only a computer and printer, but cases of paper, envelopes for mailing, files, pens/pencils, highlighters and other materials one finds in normal operations of an office. Moreover, Davisson fronted the cost of small claims filing fees and allowed Davis to pay service professionals and/or the sheriff's office for evictions out of a Property Holders checking account. Additionally, Davisson initially reimbursed Davis for any supplies Davis purchased in providing administrative management activities although Davisson has not fully reimbursed Davis for some necessary expenditures. Supplying these and other items as well as reimbursing any expenses incurred by Davis in office operations appear to fit the Department of Labor's definition for Davis' "employee" status. In contrast to Davisson supplying equipment and supplies, in those instances where a property owner hires RS Consulting and Management Services to manage properties, owners do not provide equipment or supplies although owners reimburse specific costs incurred in managing

properties such as mailing expenses, specific annualized administrative expenses, court filing fees, etc. At no time were Property Holders' expenses paid from RS Consulting and Management Services corporate accounts in carrying out administrative management of rental properties for Property Holders.

12. Although Debtor's Motion alleges in paragraph 7 that Debtor's occupancy rate declined from 30 properties to 5 properties, this is not supported by the properties that remained rented following the date Property Holders' Chapter 11 bankruptcy was filed. It is true occupancy declined but this resulted for various reasons including tenants who had fears related to the home they were renting being foreclosed on, leaving the tenant without options as well as tenants becoming frustrated with either an increase in the monthly rent charged, frustrations with maintenance activities that Property Holders failed to resolve, and, in some instances, were by design in order for the property to be rehabbed and rerented to better qualified tenant.

13. Davis rented a total of four properties after beginning work with Property Holders with delays occurring because of property conditions that were not resolved or were slow to be resolved and may have been cited by the city for being out of compliance with the city housing ordinance and, further, initiated a lease for a tenant who had applied to rent a specific property prior to Davis' employment. Further, it must be remembered that vacancies were occurring at the height of the pandemic which impacted not only individual mobility but employment options resulting in inherent challenges in rerenting properties to qualified applicants.

14. Contrary to the allegations in paragraph 8 of Debtor's Motion objecting to the payment of administrative expense that following the November 22, 2022 filing of the Chapter 11 bankruptcy, Davis was informed that her employment was terminated, no such discussion took place between Davisson and Davis. Changes to the main telephone line and to email access was not terminated until in February, 2023 which followed Davis contacting Trustee Doug Flugum (hereinafter, "Flugum") in an attempt to gain clarity regarding what was occurring in the bankruptcy which was impacting operations. Although Davis had attempted numerous times to discuss concerns with Davisson, he refused to meet with Davis in order to discuss concerns. This represented a change in the relationship between Davisson and Davis and lacking sufficient information from Davisson, Davis turned to Flugum in an attempt to obtain specific information regarding the impact of the bankruptcy on Property Holder's operations. As a result, Davis had a lengthy discussion with Attorney Rush Shortley regarding the contact with Flugum. Thereafter, Davis believes that Attorney Shortley instructed Davisson to make the above-referenced changes although there still was no discussion between Davis and Davisson. Davis continued to have contact with certain tenants and in providing other services into May, 2023 and on May 16, 2023, Davis submitted her resignation out of frustration and belief that there was no viable way to continue the employee-employer relationship even as it was clear that numerous issues remained unresolved regarding Property Holders business. It is clear from various records

Davis has maintained following the November 22, 2022 bankruptcy that Davisson had an expectation that Davis continued providing management services even as the communication appeared to be more difficult. Thus, Davis continued engaging in ongoing activities on Property Holders' behalf including the receipt of rent payments, dealing with maintenance requests, handling tenant difficulties, etc.

WHEREFORE, Davis prays that the court disregard Debtor's Motion Objecting to Davis compensation as an administrative expense and award compensation for services rendered and expenses in the amount of __$17,343.95__ for the period referenced in Davis' application for compensation and direct the Debtor to pay the balance of such fees and expenses as identified herein as a priority administrative expense.

Dated November 25, 2024.

                                                                 _/s/ Mari Davis_
                                                      Mari Davis, as (former) Administrator
                                                      Effective May 16, 2023
                                                     Property Holders Ltd
                                                     c/o 720 Center Point Rd NE
                                                     Cedar Rapids, IA 52402
                                                     PH:   (319)373-1677
                                                     Email: _iahomelocators@yahoo.com_

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 22nd of May, 2023, the original of the foregoing document was filed through the Clerk of Court for the United States Bankruptcy Court for the Northern District of Iowa as requested of the Clerk of Court using the CM/ECF system, and served electronically on those participants that receive service through the CM/ECF System.

                                                     _/s/Mari Davis. As (former) Administrator_
                                                     Property Holders Ltd

Attachment 1 (4 pgs)







Requested By: 273973100/Branch Capture   Page 1   11/12/2024 13:18:12

Date: 02/17/22   Sequence #: 002297005   Routing #: 273974581   Account #: 329756005   Check #: 2241   Amount: $ 4000.00



Inadvertent memo is
error; check written for
November 2021 salary

Attachment 2 (1 pg)



Inadvertent memo
error; check written
for December 2021 salary